In re Lonnie L. JOHNSON, Debtor.

NATIONAL POST OFFICE MAIL HAN-
DLERS, WATCHMEN, MESSENGERS
AND GROUP LEADERS DIVISION
OF THE LABORERS' INTERNATION-
AL UNION OF NORTH AMERICA,
AFL–CIO, Plaintiff,

v.

Lonnie L. JOHNSON, Defendant.

Bankruptcy No. 86–00053.
Adv. No. 86–0268.

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

April 15, 1992.

Henry Counts, Jr., Alexandria, Va., for
the debtor.

Alan Rosenblum, Rosenblum & Rosen-
blum, P.C., Alexandria, Va., Laurence E.
Gold, Connerton, Ray & Simon, Washing-
ton, D.C., for the Union.

Gordon Peyton, Alexandria, Va., Interim Trustee.

Dennis J. Early, Alexandria, Va., Asst. U.S. Trustee.

## MEMORANDUM OPINION

MARTIN V.B. BOSTETTER, Jr., Chief Judge.

The plaintiff in this action, National Post Office Mail Handlers, Watchmen, Messengers and Group Leaders Division of the Laborers' International Union of North America, AFL–CIO (the "Union") is a labor organization representing approximately 50,000 [1] postal workers classified as "mail handlers." The Union is an affiliate and a subordinate body of the Laborers' International Union of North America ("LIUNA"), which is an international union within the AFL–CIO that represents construction workers and industrial and public employees throughout the country. The defendant Lonnie L. Johnson (the "Debtor") was the National Director of the Union from 1969 until December 16, 1985. On that date LIUNA removed the Debtor from his position as the National Director and imposed a trusteeship over the Union under the control of International Trustee Louis D. Elesie ("Elesie"). On January 14, 1986 the Debtor filed a petition under Chapter 7 of the Bankruptcy Code. On May 21, 1986 the Union filed a complaint seeking a determination that certain of the Debtor's debts to the Union be declared nondischargeable pursuant to § 523 of the Bankruptcy Code, 11 U.S.C. § 523. On April 15, 1987 the Union filed an amended complaint, and on April 16, 1987 the Union filed a corrected amended complaint (the "Final Complaint")

to add two additional counts seeking a determination that the Debtor be denied a general discharge pursuant to § 727 of the Bankruptcy Code, 11 U.S.C. § 727.

The Final Complaint sets forth twelve counts. In Count 1 the Union alleges that the Debtor should be denied a discharge pursuant to § 727(a)(3) for concealing books and records from which the Debtor's financial condition might be ascertained. In Count 2 the Union seeks to bar the Debtor's discharge pursuant to § 727(a)(4)(A) for making false oaths and accounts on his bankruptcy schedules.[2]

In Counts 3 through 12 the Union urges this Court to declare that certain of the Debtor's individual debts to the Union are nondischargeable pursuant to §§ 523(a)(2)(A) & (B) for obtaining money through fraud and pursuant to § 523(a)(4) for fraud or defalcation while acting in a fiduciary capacity.[3] Specifically, in Count 3 the Union alleges that the Debtor submitted claims to and was reimbursed by the Union in the amount of $84,806.04 [4] for "parking, taxis, and tips" expenses which he did not incur. In Count 4 the Union alleges that the Debtor submitted claims for and was paid $34,842.34 in "entertainment" expenses which he did not incur. In Count 5 the Union maintains that the Debtor submitted claims for and was paid $3,317.16 for "organizational" expenses, which included purchases of video equipment, cameras, and theater tickets. The Union submits that these expenses were for the personal benefit of the Debtor and his girlfriend, Deborah McMorris ("McMorris"), rather than for the benefit of the Union, and were therefore improper.

---

1. This was the approximate number of postal workers in the Union as of January 1988. The Union has 37 local union affiliates across the United States.

2. In its post-trial brief, the Union moves to amend its Final Complaint to have this Court find that the Debtor be denied a discharge pursuant to § 727(a)(5) for failing to explain satisfactorily a loss or deficiency of assets. Because we deny the Debtor a discharge pursuant to § 727(a)(4)(A), we do not address whether the Debtor should be denied a discharge pursuant to § 727(a)(3) or § 727(a)(5).

3. In Count 11 the Union alleges violations only of § 523(a)(2)(A) and § 523(a)(4). Because we deny the Debtor a discharge pursuant to § 727(a)(4)(A), we do not address the potential exceptions to discharge of particular debts pursuant to § 523(a).

4. All amounts reflect amendments in the parties' proposed pre-trial order, which they filed on December 9, 1987.

The Union alleges in Count 6 that the Debtor submitted claims to and was reimbursed by the Union in the amount of $858.19 for which no service establishment appears imprinted on his American Express receipts. In addition, the Union alleges that the Debtor directed the Union to pay, and the Union did pay, $300.00 to the "International Who's Who of Intellectuals" for the Debtor's personal benefit. The Union alleges further that on December 18, 28, and 29, 1981[5] the Debtor incurred a total of $87.00 in charges for theater tickets for his own personal benefit and not for the Union's benefit. The Union states that the Debtor submitted claims and was reimbursed for these tickets and that the Debtor submitted a second claim for reimbursement of the same expenditure for which the Union paid him $51.00. Furthermore, the Union asserts that on December 30, 1981, the Debtor incurred $67.00 in charges for theater tickets, which were for the Debtor's personal benefit, for which he submitted a claim and was reimbursed. Finally, in Count 6 the Union claims that the Debtor incurred an expense of $14.53 for a meal at Casa Maria restaurant in Washington, D.C. for which he submitted both a customer receipt and an American Express receipt, thereby getting reimbursed twice.

In Count 7 the Union seeks to recover $2,630.20 for items that the Union alleges were missing from the Union apartment in which the Debtor resided. In Count 8 the Union asserts that the Debtor received $5,394.41 in excess salary pursuant to an amendment to the Union's constitution, which had not been approved by LIUNA. In Count 9 the Union alleges that the Debtor incurred $14,514.89 in expenses on behalf of himself and McMorris for a trip to Hawaii in November 1983 and for a trip to St. Thomas and Puerto Rico in May 1982. The Union asserts that when the Debtor incurred these expenses on behalf of McMorris, he was legally married to Gwendolyn Johnson and that the Union improperly paid these expenses. Similarly, in Count 10 the Union alleges that the Debtor submitted claims and was reimbursed for expenses totalling $7,466.96 for a trip to Nassau, Bahamas taken by the Debtor and McMorris between September 3 and 6, 1983. The Union asserts that the Debtor represented that the trip was in connection with fund raising for the National Association for Sickle Cell Disease, Inc., of which the Debtor was a member of the national board, but was actually for the personal benefit of the Debtor and McMorris. In Count 11 the Union alleges that the Debtor is liable to it in the amount of $20,000.00 for a payment that the Union made to the Insurance Company of North America in settlement of a lawsuit brought by the insurance company against the Union in 1985 for fire damage to the Union apartment in which the Debtor lived. The Union maintains that the Debtor is responsible for the damages, because a relative of McMorris caused the fire. Lastly, in Count 12 the Union alleges that the Debtor owes it $5,647.47 for a computer and accessories and for a video cassette recorder that he directed the Union to purchase for his Union-paid apartment. The Union states that the computer and video cassette recorder were for the personal benefit of the Debtor and McMorris, rather than for the Union's benefit.

The Debtor responds that he is not liable for the debts in question. He asserts further that even if he were liable, the amount of damages cannot be ascertained. In addition, the Debtor submits that the debts in question are dischargeable in bankruptcy. Finally, the Debtor denies making false statements on his bankruptcy schedules and also denies concealing assets to defraud creditors.

■ Section 727(a)(4)(A) of the Code, which we find to be controlling in the case at bar, states "[t]he court shall grant the debtor a discharge, unless ... the debtor knowingly and fraudulently, in or in connection with the case ... made a false oath or account[.]" As the United States Court of Appeals for the First Circuit has observed, this section "invokes competing considerations." *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir.1987)

---

**5.** All dates in the Count 6 allegations reflect amendments in the proposed pre-trial order.

(discussing § 727(a) generally, and § 727(a)(4)(A) in particular). One consideration is that "bankruptcy is an essentially equitable remedy." Thus, "the statutory right to a discharge should ordinarily be construed liberally in favor of the debtor." *Id.* In keeping with the policy that the discharge provisions of the Code are to be construed liberally in favor of the debtor, Bankruptcy Rule 4005 places the burden of proving an objection to discharge on the plaintiff. However, "once it reasonably appears that the oath is false, the burden falls upon the bankrupt to come forward with evidence that he has not committed the offense charged." *Id.* (quoting *In re Mascolo*, 505 F.2d 274, 276 (1st Cir.1974)). This Court has previously held, with respect to the standard of proof required in a § 727(a)(4)(A) action, that a false oath may be proven by a preponderance of the evidence. *See Green Hill Corp. v. Kim (In re Kim)*, 97 B.R. 275, 281 n. 9 (Bankr. E.D.Va.1989), *modified on other grounds*, *Union Bank v. Farouki (In re Farouki)*, 133 B.R. 769 (Bankr.E.D.Va.1991) (stating that the preponderance of evidence standard applies also in § 727 actions involving fraud).

A competing consideration is that the very purpose of § 727(a)(4)(A) is to ensure that "those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs," and that "complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction." *Tully*, 818 F.2d at 110. Recognizing these competing concerns inherent in § 727(a)(4)(A), the *Tully* court cautioned that the bankruptcy judge "must be deft and evenhanded in calibrating these scales." *Id.* We believe this to be a proper statement of the standards to be applied, and in this light we review the elements constituting a § 727(a)(4)(A) denial of discharge.

■ As the Fourth Circuit explained in *Williamson v. Fireman's Fund Insurance Co.*, 828 F.2d 249 (4th Cir.1987), in order to be denied a discharge pursuant to

§ 727(a)(4)(A), "the debtor must have made a statement under oath which he knew to be false, and he must have made the statement willfully, with intent to defraud." *Id.* at 251. Furthermore, "[t]he false oath made by the debtor must have related to a material matter." *Id.* Material matters include those "concern[ing] the existence and disposition of the debtor's property." *Id.* at 252 (citing *In re Chalik*, 748 F.2d 616, 618 (11th Cir.1984) (per curiam) ("The subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.")).

The *Williamson* court observed the inherent problems in ascertaining whether a debtor has acted with fraudulent intent. *Id.* at 252. Usually the debtor will be the only person to testify directly as to his own intent, and "[b]ecause a debtor is unlikely to testify directly that his intent was fraudulent, the courts may deduce fraudulent intent from all the facts and circumstances of a case." *Id.* (quoting *In re Devers*, 759 F.2d 751, 754 (9th Cir.1985)). *See also Farmers Co-op. Ass'n v. Strunk*, 671 F.2d 391, 395 (10th Cir.1982) ("Fraudulent intent ... may be established by circumstantial evidence, or by inferences drawn from a course of conduct.").

Moreover, courts have recognized that a "reckless indifference to the truth" is the functional equivalent of fraud. *See Tully*, 818 F.2d at 112; *Diorio v. Kreisler–Borg Constr. Co. (In re Diorio)*, 407 F.2d 1330, 1331 (2d Cir.1969) (per curiam) ("Statements called for in the schedules, or made under oath in answer to questions propounded during the bankrupt's examination or otherwise, must be regarded as serious business; reckless indifference to the truth ... is the equivalent of fraud."); *Guardian Indus. Prods. Inc. v. Diodati (In re Diodati)*, 9 B.R. 804, 807–08 (Bankr. D.Mass.1981) ("[C]ourts have held that a reckless disregard of both the serious nature of the information sought and the necessary attention to detail and accuracy in answering may rise to the level of the

fraudulent intent necessary to bar a discharge.").

With these standards as the criterion, we turn next to an examination of the Debtor's "Statement of Financial Affairs For Debtor Not Engaged In Business," which the Debtor signed under penalty of perjury indicating that his statement was true and correct to the best of his knowledge. *See Exh.* 55 (the Debtor's bankruptcy schedules). After a careful review of the Debtor's schedules and the testimony adduced at trial, we find that the Debtor has made the following false statements on his schedules:

1) In response to Question 1.d., which asks the Debtor to list where he has resided during the six years immediately preceding the filing of the petition, the Debtor failed to disclose that he resided at the Union apartment on 728 6th St., S.W., Washington, D.C. At trial, the Debtor admitted that he resided there during this period.

2) The Debtor answered "No" to Question 2.c., which asks whether the Debtor had been in a partnership with anyone, or engaged in any business during the six years immediately preceding the filing of the petition. To the contrary, the record reveals that the Debtor was an incorporator, director, and treasurer of Greenberg, Weinstein and Company, Inc., incorporated in June, 1981 "to buy, sell, hold, lease, renovate, and rehabilitate real properties, and to make any other prudent investments in connection therewith and/or with other investment opportunities." *See Exh.* 138 (copy of the Articles of Incorporation); *Exh.* 139 (copy of the minutes of an October 6, 1981 meeting of the corporation reflecting that the Debtor was elected treasurer of the corporation at this meeting).

3) In response to Question 2.d., which asks the Debtor to list the amount of income he received from his trade or profession during each of the two calendar years immediately preceding the filing of the petition, the Debtor answered "$75,000.00." The record reveals, however, that between August 1984 and April 1985 the Debtor received cash income in the annual amount of $82,000.00 from the Union pursuant to an amendment to the Union's constitution that the Union had adopted and immediately implemented, but that LIUNA had not approved. Similarly, the record demonstrates that the Debtor had free use of the Union apartment and a Union automobile, but he did not schedule these benefits as income from the Union. *Tr.* at 457; *Exh.* 57 at 11.

4) The Debtor answered "No" to Question 5.a., which asks whether the Debtor kept books of account or records relating to his affairs within the two years immediately preceding the filing of the original petition. In fact, approximately one month after filing his petition, the Debtor wrote a letter to Elesie, asking for the return of his personal files. *Exh.* 125. This letter states in relevant part that

> [t]he files consist of medical files, tax files, divorce files, cancelled personal check files, dental files, bill files on my personal account, my personal files with me and the Postal Service as a postal employee, personal files on my automobiles, personal files on bills dealing with interest and payment of bills, files on my life and health insurance, personal communications between me and my family, carbon copies of my expenses which the regional copies are in the Mail Handlers Division possession, etc.
>
> I need certain of these files immediately for the purpose of filing my income tax before leaving the city.

*Id.* Furthermore, the Debtor failed to disclose in response to Question 5.b. that he knew at the time of the filing of his petition that his personal records were in the Union's possession.

5) In response to Question 6, which asks what property the Debtor held for any other person, the Debtor answered "None." However, the Debtor stated at trial that he had possession of a Lincoln Mark V automobile that he had purchased for a friend. When asked on cross-examination why he did not consider this to be "holding" property for another person, the Debtor testified:

It was her car. When she come [sic] to pick it up, she would take it back. I wasn't holding it.

I feel holding something for another person is you are in possession of it and it's another person's; you have interest in the car or interest in the property.

*Tr.* at 541.

6) The Debtor answered "No" to Question 7, which asks whether any person was holding anything of value in which the Debtor has an interest. At trial, the Debtor testified that his former wife took his rings and bracelets when she left their apartment. On his personal financial statement dated August 23, 1984, the Debtor listed this jewelry as having an approximate value of $7,575.00. *Exh.* 76.

7) The Debtor made false statements in response to two parts of Question 10. Question 10a. asks whether the Debtor was a party to any suit pending at the time of the filing of the petition. Although the Debtor did list two lawsuits in response to this question, he failed to state that he was a plaintiff in *National Post Office Mail Handlers Division and Lonnie L. Johnson v. Laborers' International Union,* No. 85–3965 (D.D.C.), filed on December 16, 1985, in which he and the Union sought a restraining order that would enjoin LIUNA from imposing the trusteeship over the Union. *Exh.* 97. The Debtor also failed to schedule a suit in the Circuit Court for Montgomery County, Maryland styled *Gwendolyn E. Johnson v. Lonnie L. Johnson,* Equity No. 79515, in which he filed a Petition for Modification on December 31, 1985, only two weeks before he filed his bankruptcy petition. *Exh.* 112. In addition, the Debtor did not disclose that he filed a Bill of Complaint for divorce in the Circuit Court of the City of Alexandria against Brenda Johnson on January 9, 1986, just five days before he filed his

petition. *Exh.* 115. In response to Question 10.b., which asks whether he was a party to any suit terminated within the year immediately preceding the filing of the petition, the Debtor failed to disclose that he was a plaintiff in *National Post Office Mail Handlers Division and Lonnie L. Johnson v. Laborers' International Union,* No. 85–1338 (D.D.C.), filed on April 24, 1985, and dismissed in November 1985, within the year preceding the filing of the petition. *Exh.* 96.

8) The Debtor answered "None" to Question 11, which asks the Debtor to list payments that he made, in whole or in part, during the year immediately preceding the filing of the petition on loans, installment purchases of goods and services, and other debts. The testimony at trial, however, reveals that during the year preceding the filing of his petition, the Debtor made payments totalling approximately $5,715.10 to various department stores, gas companies, and Citibank Visa, and payments on his line of credit with First American Bank.[6]

9) The Debtor answered "No" to Question 12.b., which asks whether the Debtor made any transfer, absolute or for the purpose of security, or any other disposition, of real or tangible personal property during the year immediately preceding the filing of the petition. The record reveals, however, that shortly before filing his petition, the Debtor cashed in his IRA valued at $2000 to pay various creditors. The Debtor testified that he used the money from his IRA to pay alimony to his former wife, tuition for his daughter, to provide for his son, and to pay various bills.

10) In response to Question 15.a., which asks whether the Debtor has consulted with an attorney during the year immediately preceding or since the filing of the

**6.** The Debtor's secretary Betty Kinney testified that she made handwritten notations that say "paid" on the Debtor's bills to indicate that the bills were paid on certain dates from his personal accounts and at his direction. The following payments were made:

1) $723.80 to Hecht's Inc. *Exhs.* 152, 172.
2) $521.87 to Woodward & Lothrop. *Exhs.* 153, 154, 176.

3) $167.99 to Citibank Visa. *Exhs.* 155, 170.
4) $688.70 to Gulf Oil. *Exhs.* 156, 171.
5) $841.00 to Sears, Roebuck & Co. *Exhs.* 157, 174.
6) $490.00 to Shell Oil Corporation. *Exhs.* 158, 175.
7) $301.74 to Raleigh's. *Exhs.* 159, 173.
8) $1,980.00 to First American Bank on his line of credit. *Exh.* 160.

petition, the Debtor listed only his bankruptcy attorney. The Debtor failed to disclose that during the year before filing his petition, he consulted with at least six attorneys other than his bankruptcy attorney.[7] Furthermore, ignoring Question 15.c. which asks that the Debtor disclose payments made to any attorneys within the year immediately preceding or since the filing of the petition, the Debtor failed to disclose that during the year immediately preceding the filing of his petition, the Debtor made three payments totalling $157.50 to an attorney, Patrick Dragga. *Exhs.* 101–103 (bills from Dragga's law firm); *Exh.* 169 (checks from the Debtor to Dragga dated within the year preceding the bankruptcy filing).

11) On the Debtor's Schedule of Current Income and Current Expenditures, the Debtor listed a monthly expense of $400.00 for rent or home mortgage payments. At trial, however, the Debtor admitted that he had been living in the Union-paid apartment rent free.

12) Lastly, on his Schedule B–2 the Debtor listed "None," in the category of "m. Tangible personal property of any other description." In fact, the Debtor owned at least seventy-six plaques, eight framed pictures, and seven plastic horses, which he kept at his Union office and which he collected from Elesie, after LIUNA imposed the trusteeship over the Union. *See Exh.* 127 (certification by the Debtor that Elesie returned these items).

Given the Debtor's false statements on his schedules and the testimony adduced at trial, we find that the Union has proven by a preponderance of the evidence that the Debtor has made false oaths within the meaning of § 727(a)(4)(A). Each of the false oaths was material in that each was pertinent to the discovery of assets, the

disposition of assets, or the Debtor's business transactions or estate. *See Williamson,* 828 F.2d at 252 (defining "material"). "The trustee and creditors are entitled to honest and accurate signposts on the trail showing what property has passed through the Debtor's hands during the period prior to his bankruptcy." *Diodati,* 9 B.R. at 807. We briefly address those material misstatements and omissions that we find to be the most significant.

First, the Debtor's failure to disclose that he received excess salary of $5,394.41 and that his former wife was holding his jewelry both concern the discovery of assets. Second, the Debtor's failure to admit that he kept personal books and records of his affairs prevented creditors from examining those records to ascertain the Debtor's financial condition. Third, the Debtor's failure to schedule his interest in Greenberg, Weinstein and Company, Inc. prevented creditors from ascertaining whether that interest was of any value. Fourth, the Debtor's failure to mention that he made payments on his credit cards and that he liquidated his IRA related to the disposition of his assets. Finally, the Debtor's failure to disclose that he was a plaintiff in *National Post Office Mail Handlers Division and Lonnie L. Johnson v. Laborers' International Union,* No. 85–3965 (D.D.C.) was material in that a judgment in the plaintiffs' favor may have resulted in the Debtor's reinstatement in a position at the Union.

We also find that the Debtor had the requisite fraudulent intent required to bar discharge pursuant to § 727(a)(4)(A). As we noted above, fraudulent intent can be inferred from circumstantial evidence or by inferences drawn from a course of conduct. In addition, the fraudulent intent element is satisfied if the Debtor has exhibited a

---

**7.** The Debtor consulted the following attorneys: 1) David Epstein, with respect to Civ. Action No. 85–1338 in Washington, D.C. *Exhs.* 96, 97, 98. 2) Dennis Clark, with respect to legal services performed between August and December 1985. *Exh.* 100. 3) William Peer, who was the Union's attorney. *Tr.* at 339.

4) George B. Driesen, regarding a severance pay plan for the Debtor. *Exh.* 99. 5) Dorothea Peters, in connection with the Debtor's divorce from Brenda Johnson. *Exh.* 114. 6) Ann Sundt, regarding a Petition for Modification in the Circuit Court for Montgomery County, Maryland in *Gwendolyn E. Johnson v. Lonnie L. Johnson,* Equity No. 79515. *Exh.* 112.

"reckless indifference to the truth." In the case at bar, we find that these standards have been satisfied.

In examining the circumstantial evidence in this case, we find it significant that the Debtor made at least eight material omissions from his schedules, and we infer fraudulent intent from his answers. Specifically, we find it significant that when the Debtor completed his schedules on January 10, 1986, he answered "No" to question 5.a, which asks whether the Debtor kept books or records relating to his affairs within the two years preceding his bankruptcy filing. On February 13, 1986 the Debtor wrote to Elesie, asking for the return of numerous personal files, including

> medical files, tax files, divorce files, cancelled personal check files, dental files, bill files on my personal account, my personal files with me and the Postal Service as a postal employee, personal files on my automobiles, personal files on bills dealing with interest and payment of bills, files on my life and health insurance, personal communications between me and my family, carbon copies of my expenses which the regional copies are in the Mail Handlers Division possession, etc.

*Exh.* 125. We find it inconceivable that the Debtor did not know about these personal files when he completed his schedules only one month before writing the February 13th letter, which outlined in detail the records that he was attempting to recover. We cannot find that the Debtor's failure to mention these records was merely an oversight.

We similarly infer fraudulent intent from the Debtor's failure to disclose that he was a plaintiff in *National Post Office Mail Handlers Division and Lonnie L. Johnson v. Laborers' International Union,* No. 85–3965 (D.D.C.), which was filed less than one month before the Debtor's bankruptcy filing. The Debtor had a significant interest in the outcome of this lawsuit, because he was seeking to enjoin LIUNA from imposing the trusteeship over the Union of which he was the National Director. We again find it inconceivable that the Debtor

was unaware of this lawsuit, which was pending when he completed his schedules on January 10, 1986.

Finally, we stress that although the Debtor did file an amendment to schedule A–3 listing additional creditors, he made no attempt to correct the deficiencies outlined above. *See In re Shebel,* 54 B.R. 199, 204 (Bankr.D.Vt.1985) ("Although amending the petition cannot expunge a false oath, amendment may negate fraudulent intent . . . if the later disclosure is voluntary, and not in response to the fear of discovery.") (citations omitted). Moreover, not only did the Debtor fail to amend his schedules to add the omitted information, but at trial the Debtor stated that his schedules listed all of the assets he owned when he filed his petition. This assertion, viewed in light of the exhibits and testimony demonstrating that the Debtor made substantial material omissions from his schedules, supports our conclusion that the Debtor had the requisite fraudulent intent required for a § 727(a)(4)(A) denial of discharge.

Assuming arguendo that fraudulent intent could not be inferred from the circumstantial evidence, we must find that in completing his schedules, the Debtor exhibited a reckless indifference to the truth, which is the equivalent of fraud for purposes of § 727(a)(4)(A). In *Diodati,* the court found that the Debtor's schedules contained seven false answers and observed:

> Individually, any one answer may have been the result of an innocent mistake. However, the cumulative effect of all the falsehoods together evidences a pattern of reckless and cavalier disregard for the truth serious enough to supply the necessary fraudulent intent required by § 727(a)(4)(A).

9 B.R. at 808. Like the debtor in *Diodati,* the Debtor has made too many omissions from his schedules to declare them an innocent mistake. The cumulative effect of the Debtor's omissions evidences a reckless indifference to the truth, and this evidence was reinforced by the Debtor at trial when he answered "exactly" to his counsel's question of whether he owned what he told the Court he owned when he filed his peti-

tion. *Tr.* at 468. Based upon the Union's unrefuted evidence indicating that the Debtor made false oaths that were both material and fraudulent, we have no alternative but to deny the Debtor a discharge pursuant to § 727(a)(4)(A).[8]

 Although we deny the Debtor a discharge pursuant to § 727(a)(4)(A), our inquiry does not end there. The Union filed a proof of claim on May 5, 1986 in the amount of $146,862.10 plus an undetermined additional amount. The aggregate amount is set forth in the Final Complaint as modified by the pre-trial order. Pursuant to § 502(a), the Union's claim "is deemed allowed, unless a party in interest ... objects." Such an objection may be made at any time. *United States v. Kolstad (In re Kolstad),* 928 F.2d 171, 174 (5th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 419, 116 L.Ed.2d 439 (1991). Pursuant to Bankruptcy Rule 3007, "[a]n objection to the allowance of a claim shall be in writing and filed." The Debtor did not file a formal objection to the Union's claim. However, because the Debtor denied in his answer that he owes any debt to the Union, we treat the Debtor's answer as an objection to the allowance of the Union's claim.

If an objection to a claim is made, the court shall determine the amount of such claim after notice and a hearing. § 502(b). Pursuant to Bankruptcy Rule 3007, "[a] copy of the objection with notice of the hearing thereon shall be ... delivered to the claimant ... at least 30 days prior to the hearing." Because the Union had more than 30 days' notice of the Debtor's answer, we find that the trial in this case served as the hearing on the Debtor's objection to the allowance of the Union's claim.

Thus, we proceed to determine whether the Debtor is liable to the Union for the amounts in Counts 3 through 12 of the Union's Final Complaint. We turn to the Labor–Management Reporting and Disclosure Act of 1959 ("LMRDA") § 501(a), 29 U.S.C. § 501(a), which we find to be controlling on the issue of the Debtor's liability.

Section 501(a) of the LMRDA provides:

§ 501. Fiduciary responsibility of officers of labor organizations

(a) Duties of officers; exculpatory provisions and resolutions void

The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization. A general exculpatory provision in the constitution and bylaws of such a labor organization or a general exculpatory resolution of a governing body purporting to relieve any such person of liability for breach of the duties declared by this section shall be void as against public policy.

The term "officer" means any "constitutional officer" of a labor organization. 29 U.S.C. § 402(n). Pursuant to Article V, Section 1 of the Union's constitution, the National Director is the "chief executive officer" of the Union. *Exh.* 81 (All references to the Union's constitution are contained in Exhibit 81.). The term "labor organization" includes "a labor organiza-

---

**8.** As a procedural matter, we note that through clerical error an order discharging the Debtor was inadvertently entered on April 29, 1986. In addition, an Order Approving Trustee's Report of No Distribution and Closing Estate was entered in error on December 23, 1987. We will enter an order vacating these two orders in accordance with this opinion.

tion engaged in an industry affecting commerce ... which exists for the purpose ... of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment[.]" 29 U.S.C. § 402(i). The Union is recognized by the Postal Service as a labor organization, 39 U.S.C. § 1203, and the Union deals with the Postal Service concerning grievances and contract administration. *Tr.* at 176. Hence, we conclude that as an "officer" of a "labor organization," the Debtor was bound by § 501(a) of the LMRDA. Our conclusion is confirmed by 39 U.S.C. § 1209(b), which provides that "[t]he provisions of chapter 11 of title 29," including § 501(a) of the LMRDA, are applicable to the Union and its officers "to the extent to which such provisions would be applicable if the Postal Service were an employer under section 402 of title 29."

■ Although § 501(b) of the LMRDA gives an individual member of a labor organization a cause of action against a union official who violates the duties imposed by § 501(a), some courts have found that a union itself, as well as an individual member, has a cause of action pursuant to § 501(b). *See, e.g., Brotherhood of Railway, Airline & Steamship Clerks v. Orr,* 95 L.R.R.M. 2701 (E.D.Tenn.1977). However, we need not adopt this approach, because we find that the Union's cause of action is clearly implied within the provisions of § 501(a). *Operative Plasterers & Cement Masons Int'l Ass'n v. Benjamin,* 776 F.Supp. 1360, 1364–66 (N.D.Ind.1991) ("Section 501(b) neither allows nor forecloses suits by unions in federal court under § 501(a). Moreover, § 501(b) recognizes that § 501(a) creates a cause of action in favor of a union in that § 501(b) only authorizes suit by an individual after the union refuses or fails to sue or obtain other appropriate relief.").

In interpreting § 501(a) of the LMRDA, the Fourth Circuit in *Brink v. DaLesio,* 667 F.2d 420, 424 (4th Cir.1981), observed that § 501(a) "constitutes union officials trustees and requires them to act in conformity with the union constitution and bylaws." The *Brink* court explained further that "union officials are trustees 'in the special

labor context' which is to say that Congress intended 'minimum interference in the internal affairs of unions.'" *Id.* (quoting *Morrissey v. Curran,* 650 F.2d 1267, 1272 (2d Cir.1981)). However, notwithstanding its recognition that Congress intended "minimum interference" in internal union affairs, the court also stressed that "where a union official profits personally through the use or receipt of union funds, ... the official bears the burden of proving that the transaction was validly authorized in accordance with the union's constitution and bylaws after adequate disclosure, and that it does not exceed a fair range of reasonableness[.]" *Id.* (citing *Morrissey,* 650 F.2d at 1274–75).

Congress did not intend to allow union officers to rely on authorization as a complete defense,

> [f]or that would permit a union constitution to vest limitless spending power in union officers and, even where membership vote is required, leave dissenting members powerless to halt abusive practices. Such a result could not have been intended by a Congress anxious to curb the wide-scale corruption among union officials found by the McClellan Committee, which had identified the need for legislation[.]

*Morrissey,* 650 F.2d at 1272–73 (footnote omitted). Thus, although Congress did not intend the LMRDA to limit the purposes for which a union's funds could be expended pursuant to proper authorization by the union in accordance with its constitution and bylaws, such "authorization cannot be used to shield the very acts that prompted the legislation, misappropriation and abuse of union funds by officers for their personal benefit." *Id.* at 1273–74.

■ Under the *Brink* test the threshold issue is whether the union official profited personally through the use or receipt of union funds. With regard to this issue, we note that

> [h]eightened judicial scrutiny is not justified every time a union officer receives an indirect benefit from a union expenditure. For example, when a union officer

enjoys a legitimate business dinner at union expense, he has received an indirect benefit. "Obviously, however, courts cannot and should not probe into the reasonableness of every union dinner. The line should be drawn in these cases between expenditures that benefit the union and those that do not." Accordingly, if a union officer receives an indirect benefit from a transaction that also benefits the union, valid authorization will normally be a complete defense. *Council 49, AFSCME v. Reach,* 843 F.2d 1343, 1347 n. 3 (11th Cir.1988) (quoting *Ray v. Young,* 753 F.2d 386, 390–91 (5th Cir. 1985)). If the union official did profit personally through the use or receipt of union funds, then he bears the burden of proving that: (1) the transaction was validly authorized in accordance with the union's constitution and bylaws after adequate disclosure, and (2) the transaction does not exceed a fair range of reasonableness. *Brink,* 667 F.2d at 424.

▇ We now apply the *Brink* test to the Debtor's conduct so that we may determine the amount of the Debtor's liability, if any, to the Union, in connection with Counts 3 through 12 of the Final Complaint.

*Count 3: The Debtor's Allegedly Improper Expenses for Parking, Taxis, and Tips*

In Count 3 the Union asserts that the Debtor submitted claims to and was reimbursed by the Union in the amount of $84,-806.04 for "parking, taxis, and tips" expenses which he did not incur. The Union derives this figure from its allegation that from 1980 through 1985 the Debtor claimed on his expense reports that he expended $85,416.54 for "parking, taxis, and tips," but that he submitted receipts accounting for only $610.50.

Before we turn to the threshold issue of the *Brink* test as to whether the Debtor personally profited through the use or receipt of Union funds, we note the following facts. Article V, Section 9 of the Union's constitution states that "[t]he National Director shall be reimbursed for all expenses incurred in connection with and in the performance of his duties." Before an officer or employee of the Union can be reimbursed by the Union for his or her proper business expenses, the officer or employee must submit a monthly expense report setting forth such expenses. This report contains a chart with columns in which the officer or employee is to list his or her expenses in the categories of "parking, taxis, and tips," "lodging and meals," "organizational expenses," and "entertainment," among others. The Union has submitted into evidence numerous expense reports of the Debtor, spanning from December 13, 1979 through October 8, 1985. *Exhs.* 1–54.

Expenses for "parking, taxis, and tips" fit into column 4 on the expense report. The Union's national orientation manual states that for "parking, taxis, and tips" expenses entered onto the expense report, the employee should submit accompanying receipts to support these expenses if the employee can obtain such receipts. *Exh.* 69 (All references to the Union's orientation manual are contained in Exhibit 69.).[9] More importantly, the orientation manual states that "written explanations for all [parking, taxis, and tips] expenses are required on the reverse side of the report."

The testimony reveals much about the way the Debtor kept track of his expenses. Betty Kinney, the Debtor's personal secretary, testified that she filled out his expense reports from 1981 until LIUNA removed the Debtor from office on December 16, 1985. She testified that when the Debtor prepared his expense reports, he would direct her to total his personal bills for the period in question, up to four months in some instances, including "[t]he Woodies, Hecht's, and all of his personal, medical bills." *Tr.* at 116–17. Kinney would inform the Debtor of the amount he owed for his personal bills, and the Debtor then would dictate to her amounts that she would fill in to his expense reports column by column. Sometimes he dictated from receipts; other times he did not. When he

---

9. Although the manual in evidence was dated December 1983, the Court finds from the testimony that this manual's expense rules were in place from 1980 through 1985. *Tr.* at 261.

had no receipt, he did not refer to any other record of expenses in her presence.

After dictating the expense amounts for a particular column, the Debtor would have Kinney fill out the "explanation" for particular expenses on the back of the expense report. The Debtor used the same procedure for the explanations as he did for the expenses on the front of the report—using receipts when he had them; otherwise he dictated "from the top of his head." *Tr.* at 131. Kinney stated that a dictating session to prepare one of the Debtor's expense reports would take one to two hours.

Article X, Section 4 of the Union's constitution states that "[t]he Financial Officer shall be required to review and approve the expenses of the National Director." The Financial Officer from 1980 through April 2, 1984 was Vito Magrino. On April 2, 1984 Joseph Amma succeeded Magrino as the Financial Officer, and Amma remained the Financial Officer until LIUNA imposed the trusteeship over the Union on December 16, 1985. Kinney testified that she never discussed with either Financial Officer the method that the Debtor used to generate his expense reports. However, when the Financial Officer occasionally would return one of the Debtor's expense reports for insufficient explanation on the back of his expense report, the Debtor simply would dictate an explanation to Kinney at that time.

The proper procedure for expense reimbursement was for the Debtor to submit an expense report to the Financial Officer for review. After the Financial officer approved an expense report, the Union's Comptroller, Rippon Bowen, would reimburse the Debtor for the amount claimed. Kinney confirmed that she would receive a reimbursement check that she would deposit into the Debtor's personal savings or checking account.

However, the proper procedure was not typically followed while Magrino was the Financial Officer. Magrino was also the Regional Director for the northeast region of the Union during his entire tenure as the Financial Officer, and his office as Regional Director was in New York City. Magrino testified that approximately four days a week he would remain in his New York office and only once a week or three times a month would he travel down to Washington, D.C. to visit the national offices in his capacity as the Financial Officer. Magrino stated that when he was in Washington he would not always see the Debtor. Magrino also stated that because he spent so little time in Washington, he sometimes did not even review the Debtor's expense reports.

Even though Magrino knew that it was his constitutional duty to approve the Debtor's expense reports, he stated that when there were inadequate explanations for the Debtor's claimed business expenses, he would not address the problem with the Debtor personally. Instead, Magrino would discuss the Debtor's expense reports with Bowen, who would send the expense reports to the Debtor for additional explanations. Bowen testified that on only one or two occasions did he actually address deficiencies on the Debtor's expense reports with the Debtor, and Magrino did not make a practice of checking with Bowen to see that explanations were added. Nevertheless, Magrino never held back from the Debtor a reimbursement check for an unsatisfactory expense report, and the Debtor sometimes was reimbursed before Magrino reviewed the report.

As the Comptroller, Bowen was merely a Union employee, not a constitutional officer of the Union. Therefore, Bowen had no constitutional authority to review and approve the Debtor's expenses, and the Debtor had the authority to discipline or to discharge Bowen. Bowen testified that the Debtor occasionally requested an advance reimbursement from Bowen and that Bowen would give it to him. According to Bowen, the Debtor would say "I don't have a chance to make up my expense report right now, so I'd like to have an advance on it, and I'll make it up as soon as I can." *Tr.* at 400. Bowen stated that the Debtor needed such advances to prevent checks drawn on his personal accounts from bouncing. The Financial Officer did not give prior approval for these advances.

Bowen had permission to use a check-signing device, which produced the signature of both Magrino and the Debtor. Magrino testified that the purpose of the machine was to pay expenses and bills, and that most of the time the device was used to sign checks because the signature of both Magrino and the Debtor were required on checks and both men were often out of town. Amma testified that during his tenure as the Financial Officer, Bowen continued to use the device to produce the facsimile signatures of the Debtor and Amma.

Amma testified that, during his tenure as the Financial Officer, he did question the Debtor about certain of the Debtor's claimed expenses. Amma stated that the Debtor subsequently removed some of these expenses from the expense report, but Amma also stated he always approved the Debtor's expense report in one form or another.

Reviewing the Debtor's expense reports was the responsibility of the Financial Officer. However, the Union's Policy and Steering Committee had the responsibility of approving the Union's expenses as a whole. The Policy and Steering Committee was comprised of the National Director, the Financial Officer, and the five Regional Delegates representing the five existing regions of the organization respectively. The Committee is "the governing body of [the Union] between National Conferences" pursuant to Article V, Section 5 of the Union's constitution. Furthermore, it was the Debtor's duty to "preside over all sessions of the ... Policy and Steering Committee as its Chairman," pursuant to Article VI, Section 4 of the constitution. Kinney testified on cross-examination that the Policy and Steering Committee met every three to four months, and that it was customary for the Committee to discuss expenses, including those of the Debtor. After discussion, the Committee would vote on whether to approve or disapprove the Union expense report, and to Kinney's knowledge there was never a time when the expense report was disapproved.

Kinney clarified her testimony on her re-direct examination by stating that the expenses that the Policy and Steering Committee approved were the blanket expenses for the Union as a whole. The Committee never convened to approve an expense report for the Debtor individually. Magrino and Amma confirmed that the Committee did not review the Debtor's expense reports but only reviewed a financial sheet with a lump-sum total for all expenditures. One category on the financial sheet stated the total of all expenses incurred by the Union officers and employees who had submitted expense reports for the period under consideration. Such expenses were not broken down by individual accounts.

The Debtor's testimony contrasted sharply with the testimony of the other witnesses. His answers were unresponsive and evasive. The Debtor testified that he carried with him a small tape recorder into which he recorded each expense and the date it was incurred. Prior to the preparation of his expense reports, he would write down the recorded information onto a piece of paper at home. He then described how he would have this paper on his desk at work and dictate his expenses to Kinney from the paper, so that she could transcribe the expenses onto the expense reports.

The testimony of the Debtor regarding the tape recorder contrasted also with his own previous answers at a deposition conducted by the Union's attorney. In response to the question of how he kept track of his expenses when he traveled, the Debtor answered that he made notes "[o]n pieces of papers and stuff and put it in [his] wallet and transferred it to the ledger book when [he] got back to the office." *Tr.* at 493. When asked at trial why he did not mention a tape recorder at the deposition, the Debtor stated "I said there was [sic] notes and stuff," and he answered affirmatively when the Union's counsel asked whether the tape recorder is "the stuff." *Id.*

Turning to the *Brink* test for § 501(a) of the LMRDA, this Court finds that a substantial portion of the $85,416.54 that the

Debtor claimed for "parking, taxis, and tips" was for his personal benefit, rather than for the Union's benefit. The Debtor was "reimbursed" for expenses that he simply made up. The Debtor dictated his alleged business expenses "from the top of his head" immediately after Kinney had totalled his personal bills. On other occasions, the Debtor directed Bowen, who had no constitutional authority to approve the Debtor's expenses, to give the Debtor advances even before the Debtor had prepared an expense report. The Debtor's testimony concerning his routine for keeping track of his expenses was unpersuasive.

Because we find that the Debtor personally profited from his receipt of Union funds, he bears the burden of proving that these transactions were validly authorized in accordance with the Union's constitution and bylaws after adequate disclosure, and that each transaction did not exceed a fair range of reasonableness.

Although Article VI, Section 5 of the Union's constitution states that "[t]he National Director shall be authorized to expend the funds of this organization in its interests for such purposes as he shall determine," this provision does not authorize the "parking, taxis, and tips" expenditures involved here, because these expenditures were not in the "interests" of the Union. Similarly, because we have found that the expenses were for the Debtor's personal benefit, he may not successfully rely on Article V, Section 9 of the Union's constitution, which states that "[t]he National Director shall be reimbursed for all expenses incurred in connection with and in the performance of his duties."

Furthermore, the Debtor can neither rely on the fact that the Financial Officer's signature is on the expense reports, nor on the fact that the Policy and Steering Committee approved all Union expenses. Magrino, who as the Financial Officer was constitutionally required to review the Debtor's expenses, did not properly ensure that the Debtor provide written explanations for his "parking, taxis, and tips" expenses on the back of each report as required by the Union's orientation manual. In any event the Financial Officer's signature on reimbursement checks was typically produced by the check-signing device in Bowen's control. The Policy and Steering Committee never saw any of the Debtor's expense reports; the Committee approved Union expenses in summary form.

Because the Union's orientation manual requires that "written explanations for all expenses are required on the reverse side of the report," we hold that the Debtor is liable to the Union in the amount of $84,518.09, which represents all claims for reimbursement for "parking, taxis, and tips" on the Debtor's expense reports that did not include an explanation on the back of the form.[10] Because we conclude that the Union did not validly authorize these expenditures in accordance with its constitution and bylaws after adequate disclosure, this Court need not determine whether these expenses exceeded a fair range of reasonableness. However, we find that $84,518.09 is a manifestly unreasonable sum to spend on parking, taxis, and tips over a period of less than six years.

*Count 4: The Debtor's Allegedly Improper Expenses for Entertainment*

In Count 4 the Union asserts that the Debtor submitted claims for and was paid $34,842.34 in "entertainment" expenses which the Debtor did not incur. The Union derives this figure from its allegation that from 1980 through 1985 the Debtor claimed on his expense reports that he expended $54,086.15 for "entertainment," but that he submitted no vouchers[11] for $34,842.34 of this amount. The Union also alleges that of the $54,086.15 the Debtor claimed for "entertainment" expenses, $14,411.43 was for the consumption of food and drink for the Debtor alone, but that an individual's consumption of food and drink while alone is not a proper "entertainment" expense.

---

**10.** Only four expense report exhibits contain an explanation of particular "parking, taxis, and tips" expenditures. *Exhs.* 11, 16, 17, 47.

**11.** The testimony indicates that "voucher" and "receipt" are used interchangeably.

Lastly, the Union alleges in Count 4 that $9,338.36 of the $14,411.43 in "entertainment" expenses was improper for the additional reason that the Debtor incurred them in Washington, D.C., the Debtor's place of residence.

Before we turn to the threshold issue of the *Brink* test, we note the following facts. The expense reports themselves state that each entertainment expense must be itemized on the back of the report with an explanation of the time, date, place, number of people, and the business relationship among those involved. Any expense in excess of $25 required a receipt to be attached.

Regarding "entertainment" expenses, the Union's national orientation manual states that a Union officer or employee must "enter only the exact amount spent for meals when entertaining another official[.]" In addition, the orientation manual provides that "[r]eimbursement for breakfast, lunch, or dinner when it is in, or near the city where employee works, or lives, will not be permitted[, except] when another official or person that has direct or indirect relation to the employee's job, as a Union representative, accompanies employee at such meals."

We find that, pursuant to the internal rules of the Union as defined in the orientation manual and on the expense reports themselves, an expenditure qualified as an "entertainment" expense only if it involved Union business and persons other than the Union member who claimed the expense. A Union member could not properly classify meals that he had alone as "entertainment." We find further that a Union member would not have to submit a receipt for reimbursement, unless the claimed "entertainment" expense was in excess of $25.

The Debtor's explanations on the back of his expense reports reveal that he routinely charged meals that he ate alone to the Union as "entertainment." The Debtor frequently made numerous "entertainment" expense entries on an expense report for the same evening in amounts less than $25, describing each as being for "dinner." More than ninety percent of the total number of individual "entertainment" expense entries were in amounts less than $25. *Exh.* 57 (report of the accounting firm that analyzed the Debtor's expense reports).

Under the criterion of *Brink*, this Court finds that $14,411.43 of the $54,086.15 that the Debtor claimed for "entertainment" was for his personal benefit, rather than for the Union's benefit. On his expense reports the Debtor claimed $14,411.43 for which his own explanations revealed that the expenditures were for himself while he was alone. The Union's rules required that an "entertainment" expense must involve Union business and other people to be properly reimbursable.

Because we find that the Debtor personally profited, he bears the burden of proving that these transactions were validly authorized in accordance with the Union's constitution and bylaws after adequate disclosure, and that each transaction did not exceed a fair range of reasonableness.

The Union did not validly authorize these "entertainment" expenses in accordance with its constitution and bylaws after adequate disclosure. Nothing in the Union's constitution or rules authorized the Debtor to seek or to obtain reimbursement for his own personal expenses. The Debtor's practice was contrary to the explicit rules of the Union. Furthermore, because the Debtor characterized the overwhelming majority of his "entertainment" entries in amounts less than $25, we must infer that he intentionally avoided the requirement of having to submit receipts with his expense reports. These actions by the Debtor prevented the Union from properly reviewing his claimed "entertainment" expenses.

We hold that the Debtor is liable to the Union in the amount of $14,411.43, because this is the amount that the Debtor billed to the Union as "entertainment," when in fact he used the Union's money for his own benefit. Because we conclude that the Union did not validly authorize these expenditures in accordance with its constitution and bylaws after adequate disclosure, we need not determine whether these expenses exceeded a fair range of reasonableness.

However, the inescapable conclusion is that $14,411.43 in improper "entertainment" expenses is unreasonable.

*Count 5: The Debtor's Allegedly Improper Organizational Expenses*

In Count 5 the Union asserts that the Debtor improperly submitted claims to and was reimbursed by the Union in the amount of $3,317.16 for "organizational" expenses that he had incurred to purchase such items as video equipment and video tapes, a television and eight track player, camera equipment, photo processing and supplies, and theater tickets. The Union alleges that the Debtor purchased these items for the personal benefit of himself and McMorris, rather than for any Union benefit.

The record reveals the following facts. In the summer of 1983 the Debtor submitted expense reports to and was reimbursed by the Union for video equipment, video tapes, a television, and an eight track stereo player for "the union apartment." *Exhs.* 41–43A. The Debtor claimed these expenses in the column for "organizational expenses," and he provided a receipt and an explanation on the back of the expense report for each expenditure. The Union's orientation manual states that "organizational expenses" are those "for special items such as postage and supplies that have been purchased for official Union business."

We find that the Debtor is not liable to the Union for his allegedly improper "organizational" expenses. With respect to these allegations, the Union did not present sufficient evidence for us to conclude that the Debtor profited personally through the use or receipt of Union funds.

*Count 6: The Debtor's Allegedly Improper Expenses for Miscellaneous Items*

In Count 6 the Union asserts that the Debtor submitted claims to and was reimbursed by the Union in the amount of $1,377.72 for expenses that the Debtor either did not actually incur or did not properly charge to the Union. This amount allegedly represents the sum of various improper expenses.

First, the Union alleges that the Debtor submitted and was reimbursed for American Express receipts in the amounts of $251.00 and $178.29 dated September 3, 1980, and in the amounts of $176.36 and $252.54 dated September 4, 1980, for which no service establishment appears imprinted on the receipt. Second, the Union alleges that on October 31, 1980, the Debtor directed the Union to pay $115.00 to the "International Who's Who of Intellectuals," and on December 7, 1982, the Debtor directed the Union to pay an additional $185.00 to this organization. The Union asserts that the Union made these payments for the purpose of placing a biography of the Debtor in volumes entitled "The International Who's Who of Intellectuals," and for the purpose of buying copies of these volumes. The Union charges that the Debtor caused these payments to be made for his own personal benefit and not for the Union's benefit. Third, the Union alleges that on December 18, 28, and 29, 1981, the Debtor incurred $87.00 in charges for theater tickets for which he was reimbursed by the Union and which were for his personal benefit, not for the Union's benefit. The Union also asserts that after the Debtor was reimbursed for this $87.00, he subsequently was reimbursed again for $51.00 of the same expense. Fourth, the Union alleges further that on December 30, 1981, the Debtor incurred an expense of $67.00 for theater tickets for which he was reimbursed by the Union and which were for his personal benefit, not for the Union's benefit. Finally, the Union alleges that on January 1, 1982, the Debtor incurred an expense of $14.53 for a meal at the Casa Maria restaurant in Washington, D.C., for which he submitted both a customer receipt and an American Express receipt, thereby getting reimbursed twice.

Regarding the four American Express receipts on which no service establishment appears imprinted, the only evidence that the Union has put forth is a copy of each of the four receipts. *Exh.* 11A. The Union is correct in its contention that there is no imprint on these receipts to reflect the service establishment where each expense was incurred. However, we find that this evi-

dence, standing alone, is insufficient to establish that the Debtor profited personally through the use or receipt of Union funds.

Regarding the "International Who's Who of Intellectuals," the evidence reveals that the Debtor did direct the Union to pay $300 to this organization for the purchase of both a standard edition and a luxury edition of the volume in which his biography appeared. *Exhs.* 131–36. Here we must also find that this evidence, standing alone, is insufficient to establish that the Debtor profited personally through the use or receipt of Union funds.

Regarding the theater tickets, which the Debtor allegedly charged to the Union in December 1981, the Union's primary evidence is an expense analysis compiled by the accounting firm Pannell Kerr Forster. The accountants' report states in conclusory fashion that the Debtor billed the Union twice for certain of these theater tickets. *Exhs.* 57, 59. Referring to the Debtor's pertinent expense reports, we are unable to verify the accountants' conclusion. *See Exhs.* 24–25. We find that the Union's evidence is insufficient to establish that the Debtor double-billed the Union for these theater tickets. Furthermore, because the Union put forth no evidence that the theater tickets, which were paid for by the Union, were for the Debtor's personal benefit, we are constrained to find that the Union failed to prove that the Debtor profited personally through the use or receipt of Union funds.

Finally, regarding the meal at the Casa Maria restaurant, the only evidence in support of the Union's allegations is a copy of the American Express receipt and the conclusory statement of the accounting firm that the Debtor double-billed this expense to the Union. Given all of the evidence before us, this Court is unable to verify the accuracy of the accountants' conclusion. This evidence, standing alone, is insufficient to establish that the Debtor profited personally through the use or receipt of Union funds.

To summarize our conclusions regarding Count 6 of the Union's Final Complaint, we find that with respect to each separate allegation of wrongdoing by the Debtor, the Union failed to establish that the Debtor profited personally through the use or receipt of Union funds as required by the *Brink* test for § 501(a) of the LMRDA. Therefore, the Debtor is not liable to the Union for any of the expenses that were the subject of Count 6.

*Count 7: The Debtor's Alleged Liability for Items Missing from his Union-paid Apartment*

In Count 7 the Union asserts that from August 1978 until February 1986, the Debtor resided in a Union-paid apartment in Washington, D.C. and then in Alexandria, Virginia. The Union alleges that the Debtor was responsible for the removal and loss of various items and furniture from the Union-paid apartment. The Union alleges that it conducted an inventory of the items missing from the apartment and determined that the amount of the loss was $2,630.20. The Union therefore seeks in Count 7 to hold the Debtor liable for $2,630.20.

Unlike the previously addressed counts of the Final Complaint, the allegations of Count 7 involve the loss of Union property rather than the misuse or receipt of Union funds. Pursuant to § 501(a) of the LMRDA, "[i]t is ... the duty of each [officer of a labor organization] to hold its money and property solely for the benefit of the organization and its members[.]" With respect to the allegations of Count 7, the issue is whether the Debtor breached this duty that he owed to the Union and caused the loss of these various items from the apartment.

Before we address this issue, we review the following facts. In 1978 the Union rented an apartment in Washington, D.C. for the purpose of housing Union officials who came into town on business. The Debtor stated that he lived at this Union-paid apartment from 1980 until December 30, 1983, when a fire occurred in the apartment. After the fire, the Debtor moved to a Union-paid apartment in Alexandria.

On January 7, 1986, soon after the Debtor was removed as the National Director, the Debtor wrote Elesie a letter requesting

an extension of time that would allow him to live in the Union-paid apartment until February 15, 1986. *Exh.* 122. The Debtor stated in the letter that the purpose of the extension was to compile a list of the apartment property that belonged to the Union. The Debtor admitted that some of the Union property had been taken from the apartment without his knowledge and consent, and stated that "[i]f the Union is unable to recover on its insurance policy for this property, I will assume financial responsibility for it, in an amount not to exceed $2,800.00, because I am unable to fix an exact amount." *Id.*

Elesie responded to the Debtor on January 14, 1986, with a letter in which he allowed the Debtor to reside in the apartment until February 15, and advised the Debtor that a Union employee would visit the apartment to inventory the Union property there and to determine which Union property was missing. *Exh.* 123. So that the Union could properly file an insurance claim, Elesie also asked the Debtor to detail the circumstances surrounding the removal of the Union property from the apartment and the steps that he took to recover that property. *Id.* Bowen subsequently conducted an inventory at the Union apartment and determined that the value of the missing property was $2,630.20. *Exh.* 129.

On February 14, 1986, in a letter to Elesie, the Debtor elaborated on the circumstances surrounding the removal of the Union property from the apartment. *Exh.* 126. He stated that his ex-wife removed the property, and that he did not know her address or how to find her. He also stated that in October he notified Amma and Bowen as soon as he found out that the property was missing. He also told Elesie that he had notified the Union's general counsel and his own domestic relations lawyer. The Debtor never reimbursed the Union for the loss of this Union property.

Turning to the issue of whether the Debtor breached his fiduciary duty to the Union and caused the loss of various items from the apartment, the Union presented no evidence that the Debtor was respon-

sible for causing this loss. The Union relies on the evidence that the Debtor admitted that his ex-wife took the property from the apartment without his knowledge and consent and that he agreed to assume responsibility for the loss in an amount not to exceed $2800. This evidence, standing alone, does not establish that the Debtor committed a breach of fiduciary duty that caused this loss. Nor did the Union present any evidence that the Debtor was negligent in causing this loss. *See Richardson v. Tyler,* 309 F.Supp. 1020, 1023 (N.D.Ill.1970) (The plaintiff failed to prove breach of the fiduciary duty imposed by § 501(a), where the plaintiff offered no evidence to show that the defendant was responsible for the loss of funds which the defendant attributed to a burglary.). Therefore, we find that the Debtor is not liable to the Union for the items missing from the Union-paid apartment.

*Count 8: The Debtor's Alleged Excess Salary*

In Count 8 the Union asserts that the Debtor was paid $5,394.41 in excess salary pursuant to an amendment to the Union's constitution, which had not been approved by LIUNA.

Before we turn to the *Brink* test, the following pertinent facts must be noted. At the Union's national conference, which took place in Honolulu, Hawaii in August 1984, the elected delegates of the Union voted for several amendments to the Union's constitution. Elesie attended this conference and testified that one of those amendments was to change the salary of the National Director from $75,000 to $82,500 per year. Article XI, Section 10 of the Union's constitution stated that "[s]uch amendments shall not become effective until their subsequent approval by the General Executive Board of LIUNA." Amma, who had been appointed Financial Officer on April 2, 1984, was elected Financial Officer at this conference and gave undisputed testimony that the Union implemented this salary amendment immediately after the conference, at the Debtor's direction, but without the approval of LIUNA. Amma stated that the Debtor told him the past

practice was to implement constitutional amendments immediately.

However, after the 1984 conference, the Debtor wrote a letter dated September 19, 1984 to Angelo Fosco, the General President of LIUNA, urging LIUNA to approve the Union's recent constitutional amendments from the conference. *Exh.* 88. When LIUNA discovered that the Union had implemented the 1984 constitutional amendments without LIUNA's approval, it assigned Elesie to conduct an investigation of the Union. *Exh.* 89 (letter dated April 12, 1985 from Fosco to the Debtor). On April 15, 1985 the Debtor ordered the Union to "cease the implementation of the constitutional amendments passed in the 1984 National Conference." *Exh.* 90.

On February 17, 1986 the General Executive Board of LIUNA formally disapproved the constitutional amendment relating to the Debtor's salary increase. *Exh.* 94 (letter dated March 14, 1986 from Elesie to the Debtor). Elesie notified the Debtor that the Union was seeking repayment from him in the amount of $5,394.41 for salary that he received between August 1984 and April 1985 at the yearly rate of $82,500. *Id.* The Debtor never repaid that amount.

Under *Brink*, there can be no other finding but that the Debtor profited personally from his receipt of the salary increase. The Debtor received $5,394.41 in salary that he would not have received but for the Union's immediate implementation of the constitutional amendment in August 1984.

Because we find that the Debtor personally profited, he bears the burden of proving that this transaction was validly authorized in accordance with the Union's constitution and bylaws after adequate disclosure, and that the transaction did not exceed a fair range of reasonableness.

We find that the salary increase was not validly authorized in accordance with the Union's constitution and bylaws after adequate disclosure. Article V, Section 9 of the Union's constitution of 1980 provides that "[t]he salary of the National Director shall be $75,000 per year effective immediately." Pursuant to Article XI, Section 10 of the Union's constitution, no constitution-

al amendment shall become effective until its subsequent approval by the General Executive Board of LIUNA. The General Executive Board of LIUNA never approved the Debtor's salary increase from $75,000 to $82,500. In fact, the General Executive Board specifically disapproved the salary amendment on February 17, 1986.

We hold that the Debtor is liable to the Union in the amount of $5,394.41, the amount of unauthorized salary that the Debtor received between August 17, 1984 and April 26, 1985. Because we conclude that the Union did not validly authorize these expenditures in accordance with its constitution and bylaws after adequate disclosure, this Court need not determine whether these expenses exceeded a fair range of reasonableness.

*Count 9: The Debtor's Allegedly Improper Expenses for Trips to Hawaii, Puerto Rico, and St. Thomas*

In Count 9 the Union asserts that the Debtor submitted claims to or billed directly to the Union, at least $7,732.17 for a trip that he and McMorris took to Hawaii in November 1983, and at least $6,782.72 for a trip that he and McMorris took to Puerto Rico and St. Thomas in May 1982. The Union states that it improperly paid these expenses on the Debtor's behalf and alleges that at all times when the Debtor incurred these expenses, his spouse was Gwendolyn Johnson.

We note the following pertinent facts to be considered under the *Brink* test. The Union had a travel policy whereby an officer's spouse could accompany the officer on a Union business trip of five or more days at the Union's expense. *Exh.* 119 (motion approved by the Policy and Steering Committee on August 20–22, 1983 reaffirming the existing travel policy). Magrino testified that this travel policy referred only to a lawfully wedded husband or wife. *Tr.* at 210–11.

Elesie testified that there was a time when the Policy and Steering Committee approved the Debtor's recovery of expenses for his girlfriend McMorris instead of his spouse. Minutes from a "Confiden-

tial Policy and Steering Committee Meeting," dated January 11, 1984, did in fact state as follows:

> The Policy and Steering Committee understands that the sole person that has been living with the National Director for a number of years, is Deborah McMorris. We accept this representation from the National Director of his and her duties and responsibilities towards one another. Therefore, for the purpose of his travelling, and the policies that have been voted on as it relates to Executive Officers travelling on Union business for more than five days; and that the National Director has the right to determine whether or not their spouses should travel with them at the Union's expense, we accept the aforementioned person as being the National Director's spouse for the purpose of the resolution that was passed in 1975, and reaffirmed in August 1983.

*Exh.* 120. Magrino testified that this resolution was to apply only prospectively for travel expenses incurred by McMorris when traveling with the Debtor. He stated further that he thought the Debtor called this confidential meeting and that he could not recall any other confidential meetings ever having taken place. He also stated that he did not recall the Policy and Steering Committee ever having approved the Union's payment of McMorris's expenses prior to this January 11, 1984 meeting.

The Debtor admitted in his testimony that his girlfriend McMorris traveled with him to Puerto Rico and Hawaii, and that their expenses were billed directly to the Union, which paid these expenses. The Debtor's expense reports reveal that the trip to Hawaii lasted from November 2 to November 14, 1983 and the trip to Puerto Rico and St. Thomas lasted from May 1 to May 9, 1982.

Kinney testified that she went to Hawaii with the Debtor, one of his assistants, his ex-secretary, and McMorris in November 1983. She stated that they stayed in Hawaii for five days at the Hilton Hotel, and that they visited three hotels there to set up reservations for the Union's 1984 national conference. Kinney testified that the Debtor went to all of the hotels, but that each hotel visit lasted only about one hour, long enough to meet with the manager and the caterers. She testified that those hotel visits comprised the only Union business regarding the 1984 conference. Finally, Kinney stated that McMorris did not participate in the hotel meetings but that she did have dinner with the Union group at least part of the time.

In the light of *Brink*, we find that the Debtor personally profited at Union expense for his and McMorris's trip to Puerto Rico and St. Thomas. The Debtor admitted that he and McMorris made the trip to Puerto Rico and that the Union paid for the trip. There was no credible evidence that the trip to Puerto Rico and St. Thomas involved any Union business. We must infer that this trip was a personal vacation for the Debtor and McMorris. The expenses that the Union paid for this trip on the Debtor's behalf totalled $6,782.72. *Exh.* 29D (the bill from a Puerto Rico hotel and a check from the Union to the hotel).

With respect to the Hawaii trip, we find that the Debtor personally profited at Union expense for his trip to Hawaii but only to the extent that McMorris accompanied him at Union expense. We reiterate and heed the warning of *Council 49, AFSCME v. Reach*, 843 F.2d 1343, 1347 n. 3 (11th Cir.1988), which states that

> [h]eightened judicial scrutiny is not justified every time a union officer receives an indirect benefit from a union expenditure.... [C]ourts cannot and should not probe into the reasonableness of every union dinner. The line should be drawn in these cases between expenditures that benefit the union and those that do not.

Because the evidence reflects that the Debtor was in Hawaii to set up reservations for the 1984 conference, we do not engage in the almost impossible feat of dividing the Debtor's Hawaii expenses between legitimate business expenses and personal expenses. However, we do find that the Debtor personally profited by having the Union pay McMorris's expenses in accompanying him to Hawaii. The Debtor

admitted that the Union paid the expenses for McMorris to accompany him to Hawaii. The evidence reveals that the Union paid McMorris's air fare on the Debtor's behalf, in the amount of $2,010.85. *Exh.* 45E (McMorris's travel invoice for the Hawaii trip).

To the extent that the Debtor personally profited at Union expense, the burden shifts to him to prove that these transactions were validly authorized in accordance with the Union's constitution and bylaws after adequate disclosure, and that each transaction did not exceed a fair range of reasonableness.

The Union did not validly authorize these travel expenses in accordance with its constitution and bylaws after adequate disclosure. With respect to his expenses for the trip to Puerto Rico, the Debtor asserts that the Union approved these expenses after he returned. However, there is no evidence that the Union knowingly approved the Debtor's trip to Puerto Rico. As we stated in the discussion of the Count 3 allegations, the Policy and Steering Committee approved all of the Union's expenses in summary form. Furthermore, Bowen testified that the Financial Officer did not approve the direct billings for the Debtor's travel expenses.

With respect to McMorris's expenses for the trips to Puerto Rico and Hawaii, the Debtor makes two contentions. First, the Debtor asserts that the Policy and Steering Committee altered its spousal travel policy to apply to McMorris. Second, the Debtor asserts that McMorris had become his common-law wife by living with him for over three years, so the travel policy applied to her. Neither of these arguments is persuasive. First, the Policy and Steering Committee resolution that the Debtor refers to occurred on January 11, 1984 and was to apply prospectively for McMorris's travel expenses. Therefore, because the trips that McMorris took to Puerto Rico and Hawaii were prior to the resolution, she could not be deemed a spouse for the Union travel policy on those trips. Second, the Debtor did not prove that McMorris was his common-law wife during the trips

to Puerto Rico and Hawaii. A common-law marriage results, "when a man and woman who are legally capable of entering into the marriage relation mutually agree, in words of the present tense, to be husband and wife, and consummate their agreement by cohabiting as husband and wife[.]" *United States Fidelity & Guaranty Co. v. Britton*, 269 F.2d 249, 251 (D.C.Cir.1959). Even though the Debtor cohabited with McMorris, there was no evidence that their cohabitation "followed an express mutual agreement to be husband and wife." *Id.* at 252. In any event, the Debtor was not "legally capable of entering into the marriage relation," because during his cohabitation with McMorris he was still legally married to Gwendolyn Johnson. *Tr.* at 518 (the Debtor's testimony that he married Gwendolyn in 1968); *Exh.* 111 ("Judgment of Final Divorce" between the Debtor and Gwendolyn Johnson entered in Montgomery County, Maryland on July 12, 1984).

We hold that the Debtor is liable to the Union in the amount of $8,793.57. This figure is the sum of $2,010.85, which the Debtor improperly billed to the Union for McMorris's air fare to Hawaii, and $6,782.72, which the Debtor improperly billed to the Union for his and McMorris's trip to Puerto Rico. Because we conclude that the Union did not validly authorize these transactions in accordance with the its constitution and bylaws after adequate disclosure, we need not determine whether these expenses exceeded a fair range of reasonableness. However, we find from the record that $2,010.85 for McMorris's trip to Hawaii and $6,782.72 for the Debtor's and McMorris's ten-day trip to Puerto Rico is unreasonable.

*Count 10: The Debtor's Allegedly Improper Expenses for a Trip to Nassau, Bahamas*

In Count 10 the Union asserts that the Debtor submitted claims to and was reimbursed by the Union for expenditures totalling $7,466.96 for a trip to Nassau, Bahamas from September 3 through September 6, 1983. The Union alleges that these expenses were incurred for the personal ben-

efit of the Debtor and McMorris, and not for any Union purpose.

Before we apply the criterion in *Brink,* we note the following facts. The Debtor admitted during his direct examination that in 1983 he submitted a voucher to the Union to be reimbursed for a trip that he and McMorris took to Nassau for three to four days. The voucher indicated, and the Debtor contended, that the trip involved his work with sickle cell anemia. The Debtor served on the board of directors for the National Association for Sickle Cell Disease. He testified that, while in Nassau, he met with the head of the sickle cell chapter in Nassau, Dr. Robert D. Patrick, and that they discussed sickle cell fundraising and on-site testing.

Magrino confirmed that the Union specifically supported the sickle cell anemia charity and that the Debtor was involved with the charity and occasionally would travel in connection with his sickle cell work. However, Magrino testified that he had no knowledge of whether the Debtor went to Nassau as part of his duties with any sickle cell organizations.

Elesie testified that during the trusteeship he discovered some Nassau expenses on the Debtor's expense report covering September 3 through September 6, 1983. The only supporting explanation given by the Debtor on the back of the expense report read "Food for Nat'l Direct, attending Sickle Cell Fund Raising Campaign." *Exh.* 44. Elesie stated that subsequently he wrote a letter to the National Association for Sickle Cell Disease asking them to verify that they had met with the Debtor in Nassau between September 3 and September 6, 1983. *Exh.* 161. That organization responded to Elesie by letter stating that they held no such meetings during that period of time. *Exh.* 162.

Kinney testified that she typically made the travel arrangements for the Debtor for executive board meetings and for his work in connection with the sickle cell and Easter Seal committees. However, she did not recall arranging a trip to the Bahamas for the Debtor in September 1983.

The Debtor attempted to explain the discrepancy between his expense report explanation and the National Association's denial that it had met with him. He testified that although Dr. Patrick was formerly on the national board of directors with the Debtor, he was not affiliated with the National Association for Sickle Cell Disease at the time of this trip. The Debtor elaborated that in addition to discussing fundraising with Dr. Patrick, he also met to discuss sickle cell fundraising with a Tennessee group.

Applying the *Brink* criterion to the allegations in Count 10, we find that the Debtor personally profited at Union expense for his and McMorris's trip to Nassau. We rely both on the letter from the National Association for Sickle Cell Disease, which established that that national organization did not have any meetings with the Debtor in Nassau, and on the testimony of Magrino and Kinney that each was unaware of such sickle cell meetings in Nassau at that time. The Debtor's testimony that he met with a local sickle cell organization unaffiliated with the National Association was not credible. We must infer that this trip to Nassau was a personal vacation for the Debtor and McMorris. The Debtor admitted that he had no other purpose for going to Nassau, and when his sickle cell work was complete he relaxed on the beach. *Tr.* at 453. The Union paid at least $7,477.96 on the Debtor's behalf for this trip. *Exhs.* 44–44B (the Debtor's expense report and receipts from the Nassau trip).[12]

Because we find that the Debtor personally profited, he bears the burden of proving that the Union's expenditures in connection with his and McMorris's trip to

---

12. In Count 10 of the Final Complaint, the Union sought only $7,466.96 in damages for the Debtor's trip to Nassau. It appears that the Union misread several numerals on the Debtor's receipts. Federal Rule of Civil Procedure 54(c), incorporated by Bankruptcy Rule 7054, states that except in cases of default, "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings." We rely on this rule and find that the Debtor personally profited at Union expense in the amount of $7,477.96.

Nassau were validly authorized in accordance with the Union's constitution and bylaws after adequate disclosure, and that such payments did not exceed a fair range of reasonableness.

The Debtor contends that the Policy and Steering Committee validly authorized the Union expenditures for the Nassau trip after adequate disclosure. However, the Debtor failed to sustain his burden. He testified that he informed his executive board, which was comprised of the same members as the Policy and Steering Committee, in a February 1983 report that he was going to Nassau. He testified that his report to his executive board was "off the record," but that it was approved after going back "on the record." *Tr.* at 517. The Debtor presented no evidence of such approval other than his testimony, which we do not find credible. The Debtor failed to prove that the Policy and Steering Committee knew of his trip to Nassau, much less that the Committee approved it. With respect to the expenses of McMorris, the Union's travel policy was inapplicable, even if she were considered the Debtor's spouse, because the Debtor did not conduct "Union business" and the trip lasted fewer than five days.

We hold that the Debtor is liable to the Union in the amount of $7,477.96, the total of the Union's expenditures in connection with the Nassau trip, because there was no credible evidence that the Union approved this expenditure in accordance with its constitution and bylaws after adequate disclosure. This figure does not include amounts that the Debtor claimed in the "parking, taxis, and tips" or "entertainment" expense columns of his expense report for which we have already found him liable in our discussion of the Count 3 and Count 4 allegations. Because we conclude that the Union did not validly authorize these transactions in accordance with its constitution and bylaws after adequate disclosure, we need not determine whether these expenses exceeded a fair range of reasonableness. However, we find from the record that $7,477.96 for the Debtor's and McMorris's three-day trip to Nassau is unreasonable.

*Count 11: The Debtor's Alleged Liability for Damage to the Union Apartment Caused by Fire*

In Count 11 the Union asserts that a fire on December 30, 1983 damaged the Union apartment, in which the Debtor was residing. The Union alleges that the Insurance Company of North America, the apartment complex's insurer, brought a suit against the Union in 1985 over the damage. The Union alleges that it settled this lawsuit by paying $20,000 to the Insurance Company of North America but that the Debtor is responsible for the $20,000 in damages, because a relative of McMorris caused the fire. Therefore, the Union seeks in Count 11 to hold the Debtor liable for this $20,000 settlement payment.

As in the Count 7 allegations, this Count involves the loss or destruction of property rather than the misuse or receipt of Union funds. With respect to the allegations of Count 11, the issue is whether the Debtor was responsible for causing the fire in the Union apartment so that he should be liable for the $20,000 settlement that the Union paid to the apartment complex's insurer.

In connection with this issue, we note the following. A fire burned the Union apartment in Washington, D.C. on December 30, 1983. The District of Columbia Fire Department Incident Report indicates that the fire was caused by a candle which was burning too close to a bed and ignited the bedspread. *Exh.* 143. The insurer for the apartment complex, the Insurance Company of North America, and the insurer's lawyer communicated with the Debtor and William Peer, the Union's attorney, and made a demand for $28,797.15 from the Debtor and the Union. *Exhs.* 144–46. The insurance company subsequently filed suit for $28,797.15, naming only the Union as the defendant. *Exh.* 148. The Union's Policy and Steering Committee, acting by a telephone poll, authorized the payment of $20,000 to the insurance company in settlement of its claim, and the insurance company executed a release absolving the Union, the Debtor, and all other officers and employees of the Union from liability. *Exhs.* 147, 150.

Amma conducted the telephone poll and testified that he did not recall seeing any documents, including the Fire Department Incident Report, which indicated that the Debtor might be personally liable to the insurance company. Amma also stated that to his knowledge no member of the Policy and Steering Committee saw any such documents prior to authorizing the settlement. On his cross-examination Amma acknowledged that he was not involved in any investigations of the fire.

The Debtor admitted that he and McMorris, as well as his son, were in the apartment when the fire occurred. He explained that a candle was burning in the first bedroom, which was unoccupied, and when the wax melted, the candle rolled and ignited the bedspread.

Turning to the issue of whether the Debtor was responsible for the damages to the Union apartment caused by the fire, we hold that the Debtor is not liable to the Union. The Union presented no evidence that the Debtor was responsible for causing this loss by his negligence or otherwise.

*Count 12: The Debtor's Allegedly Improper Expenses for Purchasing Home Entertainment Equipment and Accessories*

In Count 12 the Union asserts that the Debtor directed the Union to purchase home entertainment equipment and accessories in the amount of $5,647.47 for installation in his Union-paid apartment for the personal benefit of himself and McMorris, rather than for any Union benefit. The Union derives this figure from its allegations that in April 1982 the Debtor caused the Union to buy an RCA UFP 170 video cassette recorder costing $1,085.39 from Video Concepts, and that in July 1983 the Debtor caused the Union to buy a computer, games, impact printer, color monitor, disc drive attachment, and related equipment costing $4,562.08 from W. Bell & Company, Best Products Co., and Ritz Camera Shops.

Before we turn to the *Brink* test, we note the following facts. In April 1982, the Union purchased an RCA UFP 170 video cassette recorder by check. *Exh.* 29C (listing of Union checks paid in April 1982). In July 1983, the Debtor bought computer equipment, which he billed directly to the Union. *Exh.* 151 (Union check requisition vouchers signed by the Debtor). Because these charges were billed directly to the Union, the Financial Officer had no role in approving these Union expenses.

Marcellus Wilson, a Union employee, testified that in July 1983 the computer equipment was placed in the Union apartment, which he was sharing with the Debtor at the time, and that this equipment was kept in the middle bedroom. He stated that the equipment consisted of a screen, special shelves with a library of films, and video tapes. He also stated that the Debtor's girlfriend McMorris frequently played the video tapes and one time the Debtor's son came over and played them.

Wilson testified further that he was not aware of any other Union personnel using this equipment, he never saw any computer-generated documents or word processing equipment, and he was unaware of any use of the computer for Union purposes after he left the Union apartment in July 1983. Ocie Perry, who had done business with the Union, Kinney, Magrino, Amma, and Bowen corroborated this evidence by testifying that they never saw any Union documents or bargaining proposals generated by a computer or word processor.

The Debtor testified that he bought the computer so that the Union officials who came by the apartment could do their expense reports on it and could play games on it to relax. However, he also testified that he did not have time to put together the computer completely, and it burned in the apartment fire which occurred on December 30, 1983, only four to five months after he installed it. As a result, other Union officials did not actually use the computer for their records. The Debtor stated that he was able to make some printouts for himself to take to work, and sometimes he would dictate letters to his secretary from the printouts. He stated further that nobody else saw these printouts, because they were not official Union reports.

The Debtor's testimony was corroborated by the minutes from the "Confidential Policy and Steering Committee Meeting," dated January 11, 1984 which stated that

[t]hese machines were to be used by the National Director and other officers that come in town and stay at the Union's apartment, for business and amusement purposes.

The Policy and Steering Committee view the computers as business and amusement functions for the Executives that come in town to stay at the apartment.

*Exh.* 120. The Policy and Steering Committee passed this motion unanimously.

Turning to the *Brink* test for § 501(a) of the LMRDA, we find that the Debtor did not profit personally through the use or receipt of Union funds with respect to the allegations of Count 12. The apartment in which the equipment was installed was not just the Debtor's apartment but also the Union's, and we find that the equipment was purchased for Union business and to entertain Union members. Again we heed the warning that "[h]eightened judicial scrutiny is not justified every time a union officer receives an indirect benefit from a union expenditure." *Reach*, 843 F.2d at 1347 n. 3.

Therefore, the Debtor is not liable to the Union for the purchase of the computer and video equipment, which were the subject of Count 12.

Having considered the Union's allegations in the Final Complaint, and having considered all of the relevant testimony and exhibits in the record, we hold that the Debtor is liable to the Union in the total amount of $120,595.46. We hold further that the Debtor is denied a discharge pursuant to § 727(a)(4)(A) of the Bankruptcy Code.

An appropriate order will be entered.